LATHAM & WATKINS LLP
Michael H. Rubin (Bar No. 214636)
 michael.rubin@lw.com
Melanie M. Blunschi (Bar No. 234264)
 melanie.blunschi@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

Serrin Turner (*pro hac vice*)
 serrin.turner@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Margaret A. Upshaw (*pro hac vice*)
 maggie.upshaw@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

*Attorneys for Defendant Gen Digital Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GRACE LAU, CHRISTOPHER KARWOWSKI, MELODY KLEIN, MICHAEL MCBRIDE, and AIMEN HALIM, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GEN DIGITAL INC. a corporation,<br><br>Defendant. | Case No. 3:22-cv-08981-RFL-SK<br><br>**DECLARATION OF ISKANDER SANCHEZ ROLA IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 45**<br><br>**Hon. Sallie Kim** |

I, Iskander Sanchez Rola, declare as follows:

1. I have been employed by Gen Digital for over five years and currently serve as Director of Innovation for the company. I submit this declaration in connection with the above-

captioned proceeding (the "Action"). I am fully familiar with the facts contained herein based upon my personal knowledge and information provided by counsel, and if called as a witness, I could and would testify competently thereto.

2. Gen Digital is a computer software company, formerly known as Symantec Corp. and NortonLifeLock Inc. In 2022, NortonLifeLock Inc. merged with Avast PLC ("Avast"). I understand the focus of the Action is Avast Online Security & Privacy ("AOSP"), a browser extension that, among other things, helps users avoid malicious websites.

3. In my role at Gen Digital, I am responsible for driving innovation in multiple products and interest areas at Gen Digital, and work with many different product teams and products. Through both my work and my research, I have extensive familiarity with the way that cookies work and the purposes for which cookies are used. I have a PhD in web security and privacy, and I have published peer-reviewed research on the topics of cookies and tracking. Through my work at Gen Digital I am also generally familiar with how the AOSP product works.

4. I understand that Plaintiffs claim that AOSP "embeds" certain cookies in the headers of communications that are sent to urlite.ff.avast.com (the "URLite Service), which is the service to which AOSP sends URLs of the web pages users visit to check for malicious attributes. *See* Mot. to Compel Compliance with Subpoenas, Dkt. No. 97, at 4. I have also reviewed the Declaration of Atif Hashmi filed in this Action, Dkt. No. 97-2 (the "Hashmi Declaration"), in which Mr. Hashmi identifies the cookies at issue (the "Subject Cookies") and provides examples of transmissions to the URLite Service containing these cookies. *See* Hashmi Decl. ¶ 7.

5. The Subject Cookies are cookies installed by the Avast website and are used in connection with the operation of that website. They have nothing to do with the operation of AOSP. The claim that it is *AOSP* that embeds the Subject Cookies in transmissions to the URLite Service is not accurate. Instead, it is the user's browser that appends the Subject Cookies to the transmissions. The browser does so as an unintended byproduct of the way in which

cookies and browsers operate within the HTTP protocol (the protocol used for communications on the world wide web).

6. Cookies are small text files that can be stored on a user's browser by a website and that can be used for various purposes in connection with the operation of the website. The way this works is that a cookie has a domain associated with it, such that, whenever the browser communicates with any server on that domain, the browser will automatically append any cookies associated with that domain to the communication. Specifically, the browser includes the cookie data in a "header" it adds to the communication—a type of metadata distinct from the content of the communication, known as the "payload."

7. For example, a website—call it "example.com"—may send a cookie to a user's browser with the domain parameter defined as "example.com." Thereafter, any time the browser communicates with a server on the example.com domain (which will happen any time the user visits the example.com website), the browser will automatically append the data for that cookie in the cookie header of the message. In this way, the website can use the data from the cookie in connection with the user's use of the website. Likewise, if the browser communicates with a server on a subdomain of the domain associated with the cookie—e.g., "forum.example.com" or "store.example.com"—the browser will automatically add append the cookie to communications sent to that subdomain as well. In this way, the website can use the data from the cookie in connection with the user's activity across all the subdomains that may be related to the website.

8. The reason Mr. Hashmi has observed the Subject Cookies appended to traffic sent from AOSP to the URLite Service is that (1) the domain attribute of the Subject Cookies is set to "avast.com," and (2) the URLite Service resides on an avast.com subdomain—urlite.ff.**avast.com**. AOSP is a browser extension and as such any communication it sends are sent through the browser on which it operates. Thus, when AOSP sends a communication to the URLite Service through the browser, the browser sees that the message is directed to a server on the avast.com domain, checks for any cookies associated to that domain, finds the Subject Cookies, and automatically appends them to the transmission. In other words, the browser—not

anything in the code for the AOSP application—is causing the cookie data to be sent to the URLite Service.

9. I also wish to respond to two additional points made in the Hashmi Declaration. First, the Hashmi Declaration notes that the domain parameter for a cookie may be left undefined when a cookie is initially set on a user's browser, in which case the browser will only append the cookie to communications sent to the specific domain that set the cookie—not any subdomains on the domain. *See* Hashmi Decl. ¶ 8. For example, if a server on the "example.com" domain sets a cookie on the user's browser without defining the domain parameter, then the browser will thereafter only append the cookie to communications sent to "example.com," but not to communications sent to subdomains like "forum.example.com" or "store.example.com." From this, Mr. Hashmi seems to conclude that, by defining the domain attribute for the Subject Cookies as "avast.com," Avast must have specifically intended for the cookies to be transmitted to the URLite Service. *See id*. ¶ 8 (stating that "Defendant specifically set the Domain attribute in a way that causes the cookies to be sent to the Avast's servers via the urlite.ff.avast.com subdomain").

10. This is not a valid inference. It is commonplace for the domain parameter to be specified for a cookie, so as to include subdomains of the specified domain. This is because websites frequently encompass multiple subdomains and some cookies may need to function across those subdomains. For example, Avast's website spans a number of subdomains, such as forum.avast.com, store.avast.com, and blog.avast.com, and some cookies are needed to work across those various domains. Defining the domain parameter for the cookies as "avast.com" helps to accomplish this. The fact that the cookies may also be sent to the URLite Service—which operates on the avast.com domain but is not part of Avast's website—is a byproduct of this setting. But there is no reason to conclude that it is an intended consequence. And in any event this consequence is insignificant if the URLite Service does not do anything with any cookies that might be appended to traffic that is sent to it.

11. Second, the Hashmi Declaration also suggests that the cookies used by Avast have been "reconfigured" recently so that they no longer specify the domain parameter and therefore are "no longer sent to … Avast's subdomains, including urlite.ff.avast.com." *Id.* ¶ 10. The proof asserted for this is a comparison of a cookie that Mr. Hashmi observed Avast setting on his browser in May 2024 versus a cookie that he observed Avast setting on his browser in August 2024: The first cookie included a defined domain parameter whereas the second did not. *See id.* ¶¶ 8-10. However, the two cookies referenced are entirely different cookies, as can be seen from the screenshots of the two cookies Mr. Hashmi provides—which contain entirely different data. *Compare* Hashmi Decl. Fig. 2 *with id.* Fig. 3. The fact that the domain parameter is specified in one cookie but not the other only indicates that some cookies used by Avast need to work across the various subdomains constituting the Avast website, and some do not. The difference in the two cookies does not indicate that there has been any recent change in Avast's practices.

12. Further, given that Plaintiffs allege that the Subject Cookies are somehow provided to third parties for them to use in targeted advertising, it is worth noting that neither of these two cookies cited by Mr. Hashmi include any unique identifier that could be used for advertising purposes.

   a. The cookie that appears in Figure 2 of the Hashmi Declaration is a cookie that is designed to be used for "A/B testing"—*i.e.*, testing two different versions of a website feature to see how different users (group A and B) respond to it. This is evident from the "AKA_A2=A" notation in the "Set-Cookie" header of the cookie, which sets the user variable for the cookie to "A"—which is how it can be used to classify a user as part of an "A" group for testing purposes. *See id.* at Fig. 2; *see also* Akamai, *Oct 31, 2022 — A/B testing support with A2*, https://techdocs.akamai.com/ion/changelog/oct-31-2022-ab-testing-support-with-a2 (release notes for this cookie). "A" is obviously not a sufficiently unique identifier to be used to track an individual user for targeted advertising purposes. Identifiers used for that purpose are typically much longer strings of text.

b. The cookie that appears in Figure 3 of the Hashmi Declaration is a cookie used simply to keep track of a user's language preference. This is evident from the "avastComLocale=en-us" notation in the cookie, which sets the user variable for the cookie to "en-us," which is how the user can be recognized as a U.S. English speaker. Again, "en-us" is not the sort of text string that is sufficiently long or unique to be used an identifier for targeted advertising purposes.[1]

13. I declare under penalty of perjury under the laws of the that the foregoing is true and correct.

Executed on September 6, 2024, at Mountain View, California

_____
Iskander Sanchez Rola

---

[1] It is also worth noting that both of the cookies come from Akamai. Neither are associated with Adobe or Meta, the two third parties involved in this motion.