Jonathan M. Rotter (#234137)
*jrotter@glancylaw.com*
David J. Stone (#208961)
*dstone@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Ekwan E. Rhow - State Bar No. 174604
*erhow@birdmarella.com*
Marc E. Masters - State Bar No. 208375
*mmasters@birdmarella.com*
BIRD, MARELLA, RHOW, LINCENBERG,
DROOKS & NESSIM, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Korey A. Nelson (admitted pro hac)
*knelson@burnscharest.com*
Amanda K. Klevorn (admitted pro hac)
*aklevorn@burnscharest.com*
Claire Bosarge Curwick (admitted pro hac)
*ccurwick@burnscharest.com*
Logan B. Fontenot (admitted pro hac)
*lfontenot@burnscharest.com*
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

GRACE LAU, CHRISTOPHER KARWOWSKI, MELODY KLEIN, MICHAEL MCBRIDE, and AIMEN HALIM, individually and on behalf of all others similarly situated;

Plaintiffs,

v.

GEN DIGITAL INC., et al.,

Defendant.

CASE NO. 3:22-cv-08981-RFL

**PLAINTIFFS' AND DEFENDANT GEN DIGITAL'S JOINT DISCOVERY LETTER RE: SOURCE CODE**

**Judge:** Hon. Rita F. Lin
**Magistrate Judge:** Hon. Sallie Kim

Plaintiffs Grace Lau, Christopher Karwowski, Melody Klein, Michael McBride, and Aimen Halim (collectively, "Plaintiffs") and Defendant Gen Digital Inc. ("Defendant") (together with Plaintiffs, "the Parties") hereby submit this joint discovery letter setting forth their respective positions with respect to disputes regarding Plaintiffs' discovery requests seeking the production of the entirety of Defendant's current and historical server- and database-side source code for its Avast Online Security and Privacy ("AOSP") browser extension.

Specifically, the Parties disagree regarding whether the requested source code is relevant to Plaintiffs' remaining claims in light of Defendant's position that it does not engage in the conduct alleged and whether it is unduly burdensome to produce the requested source code.

The Parties first met and conferred virtually on June 17, 2024, and have conferred both telephonically and through email correspondence several times since, with the most recent virtual meet and confer between the Parties occurring on September 19, 2024. The Parties have been unable to reach an agreement on the issues described below. The Parties' respective positions are set forth below.

The Parties have complied with Section 9 of the Northern District's Guidelines for Professional Conduct regarding discovery before filing this joint letter brief. The close of fact discovery related to summary judgment is October 7, 2024.

Respectfully submitted,

DATED: September 26, 2024

Ekwan E. Rhow
Marc E. Masters
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By: *_/s/ Marc E. Masters_*
Marc E. Masters
Attorneys for Plaintiffs

DATED: September 26, 2024

Jonathan M. Rotter
David J. Stone
GLANCY PRONGAY & MURRAY LLP

By: */s/ Jonathan M. Rotter*
Jonathan M. Rotter
Attorneys for Plaintiffs

DATED: September 26, 2024

Korey A. Nelson
Amanda K. Klevorn
Claire Bosarge Curwick
Logan B. Fontenot
BURNS CHAREST LLP

By: */s/ Korey A. Nelson*
Korey A. Nelson
Attorneys for Plaintiffs

DATED: September 26, 2024

Michael H. Rubin (Bar No. 214636)
Melanie M. Blunschi (Bar No. 234264)
Serrin Turner (*pro hac vice*)
Margaret A. Upshaw (*pro hac vice*)
LATHAM & WATKINS LLP

By: */s/ Serrin Turner*
Serrin Turner
Attorneys for Defendant Gen Digital Inc.

**PLAINTIFFS' POSITION**

**I. Relevant Factual Background[1] and the Parties' Unresolved Dispute**

Plaintiffs need to inspect AOSP's and Avast's current and historical server- and database-side source code (hereinafter, "the requested source code") to prove their claims that Defendant, by and through AOSP, invades Plaintiffs' privacy and harms them by transmitting their private data to third-party advertisers for profit. Plaintiffs' inspection of web traffic on a browser running AOSP provides visibility into AOSP's operations on the user or client's side. It does not provide visibility into what Avast does on the server- or database-side. So, while Plaintiffs' testing shows that AOSP transmits Plaintiffs' data with third party cookies back to Defendant's servers, without access to the requested source code, Plaintiffs cannot see how the data is stored, processed, and used, and what further programs and servers can access the data.

Plaintiffs first requested production of the source code just days after the May 1, 2024, initial case management conference. On May 10, 2024, Plaintiffs served their First Set of Requests for Production[2] on Defendant, wherein RFPs 7, 21-23, and 27 requested AOSP's current and historical server- and database-side source code that causes and/or enables Defendant to collect, store, and/or transmit AOSP user data to third parties. *See* Ex. A, Plaintiffs' First RFPs. In its responses and objections to Plaintiffs' First RFPs, served on June 10, 2024, Defendant refused to produce the requested source code, arguing that Plaintiffs' source code was irrelevant, overbroad and that production of the requested source code would be unduly burdensome. *See* Ex. B, Defs' Resps. and

[1] There are four relevant, upcoming case management deadlines in this case, including (i) close of fact discovery related to summary judgment: October 7, 2024; (ii) summary judgment hearing: January 14, 2025; (iii) pretrial conference: August 19, 2025; and (iv) trial: September 22, 2025. *See* ECF No. 74, Minute Entry re Initial Case Management Conference.

[2] Plaintiffs have pursued other discovery, too. Plaintiffs served Second and Third Sets of Requests for Production on Defendant on August 5, 2024, and August 28, 2024, respectively. Plaintiffs have also subpoenaed third parties Adobe, Google, Meta, Microsoft, and Reddit after identifying their cookies in AOSP's transmissions to Defendant's servers. Plaintiffs have either moved to enforce those subpoenas or are continuing to work with the third parties toward compliance.

Objs. to Pltfs' First RFPs (hereinafter "Defendants' First R&Os"). The Parties met and conferred on Plaintiffs' First RFPs on June 17, 2024, and again on July 23, 2024. The Parties agreed to engage in more targeted discovery, and Plaintiffs again sought the source code. In an August 16, 2024 letter, Defendant responded and objected to Plaintiffs' targeted requests for the source code, taking its latest position that its servers receive but do not ingest cookie data and producing three exhibits to purportedly support that position. These materials were insufficient for Plaintiffs' experts to evaluate Defendant's assertion that it does not engage in the alleged conduct. The Parties conferred yet again on September 19, 2024, and Defendant expressly refused to produce the requested source code.

### II. Plaintiffs are entitled to inspect the entirety of AOSP's and Avast's current and historical server- and database-side source code.

Defendant's latest position, taken in its August 16 letter, is that the requested source code is irrelevant to the alleged conduct and unduly burdensome to produce because, although it concedes that AOSP sends third party cookies to Defendant's servers, it asserts that Defendant's servers do not ingest the cookies with Plaintiffs' browsing data.[3] This position is contradicted by Plaintiffs' evidence and economic reality. Plaintiffs' testing shows that Defendant, contrary to its prior representations, intentionally configured AOSP to transmit cookies back to its servers, as it is AOSP, not the web browsers used in Plaintiffs' testing, that is the origin of cookie-filled transmissions back to Defendant's servers. And for Defendant's servers to segment incoming cookie data and separate it from the millions of incoming data streams before ingesting a cookieless data stream would cost millions of dollars in additional computing power over the relevant period. Given the inherent value of Plaintiffs' cookie-linked data, it is unreasonable to assume that Defendant would incur such costs when, if it was not using the cookie data, it could have configured AOSP to omit the third party

[3] Defendant's position has changed over time. First, Defendant denied that AOSP sent cookies to Avast's servers, instead claiming the cookies were sent by the user's web browser. When Plaintiffs provided evidence to the contrary, Defendant conceded that AOSP does, in fact, transmit the cookies, but now claims that its server ignores the third party cookies. *See* Ex. C, Pltfs' Supp. Resps. and Objs. to Defs' First Interrogatories.

cookies from the traffic flowing to it. It is more reasonable to infer that Defendant configured AOSP to transmit Plaintiffs' valuable cookie-linked data to Defendant so it can sell it to third parties.

Defendant's August 16 letter and the materials provided with it, consisting of portions of AOSP's code base and documentation from Avast's internal GitHub repository, are insufficient to confirm or disprove Defendant's position for at least two reasons. First, the materials pertain to a single avast.com subdomain server, urlite.ff.avast.com, and to a subsection of AOSP's code base related to a single functionality, its detection of malicious URLs. Further, the materials only show limited code-based changes made for a select few years to that subsection and functionality. In short, the materials do not rebut the reasonable inference that AOSP uses (1) some other domain or subdomain server, such as the urlite-partners.ff.avast.com server, which has the same IP address as the urlite.ff.avast.com server; or (2) some other subsection of its code base to ingest and package Plaintiffs' data with third party cookies and send it to third party advertisers.

Second, Defendant's August 16 letter notes that AOSP utilizes "X-Forwarded-For" headers in communications with Defendant's servers, suggesting that AOSP uses load balancing to distribute traffic among Defendant's servers.[4] But, the letter and materials pertain only to the urlite.ff.avast.com server and do not address whether AOSP uses load balancing to direct traffic to other servers that may be used to ingest and transmit Plaintiffs' data with third party cookies to third party advertisers. The only way for Plaintiffs' experts to evaluate whether this occurs is by reviewing AOSP's source code from its first interaction with incoming data streams to its last.

Production is further supported by the case law and applicable rules. The requested source code is highly relevant to Plaintiffs' claims. "[I]n the context of discovery, relevance has a very

[4] *See X-Forwarded-For*, MDN WEB DOCS, https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/X-Forwarded-For (last accessed Sep. 24, 2024) (explaining relationship between X-Forwarded-For header and load balancers and suggesting failure to use them together raises security and privacy concerns). Plaintiffs have not attached Defendant's August 16 letter responding and objecting to Plaintiffs' informal targeted requests because they do not fall into the categories enumerated by this Court's Standing Order, but they would be happy to provide them.

broad meaning," so broad, in fact, that "[f]or discovery purposes, the relevant code need not be limited to particular functionalities listed in Plaintiff[s'] claim[s]."[5] If AOSP's source code is configured to transmit Plaintiffs' data together with third-party cookies to third-party advertisers, that is direct evidence of Plaintiffs' claims.[6] The source code's clear centrality to Plaintiffs' claims and Defendant's being the sole entity with access to it makes its production proportional to the needs of this case.[7] Thus, the Court should absolutely order Defendant to produce it.[8]

Defendant's objections to Plaintiffs' requests are fundamentally inadequate to withhold discovery as critical to this case as the requested source code. To date, Defendant has offered no evidence that producing the requested source would be unduly burdensome.[9] Any burden Defendant may face in producing the requested source code is far outweighed by its fundamental importance to this case.[10] Moreover, the protective order entered in this case provides more than adequate protections for Defendant's proprietary interests in its source code.[11]

---

[5] *Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2008 WL 4858502, at *4 (N.D. Cal. Nov. 10, 2008) (internal citation omitted); *Calendar Rsch. LLC v. StubHub, Inc.*, 2017 WL 10378338, at *10 (C.D. Cal. Nov. 14, 2017) (internal citations omitted).

[6] Fed. R. Evid. 401.

[7] *See* Fed. R. Civ. P. 26(b)(1) ("[P]roportionality […] consider[s] […] the parties' relative access to relevant information, the parties' resources, [and] the importance of the discovery in resolving the issues.").

[8] *See, e.g.*, *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 2012 WL 7783405, at *1 (C.D. Cal. Apr. 23, 2012) (granting plaintiff's motion to compel, finding that "plaintiff's counsel should have at least some access to the entirety of the source code" to understand what portions may be relevant.).

[9] *See* Ex. B, Defendants' First R&Os; *In re Google Litig.*, 2011 WL 286173, at *5 (N.D. Cal. Jan. 27, 2011) ("no concrete, particularized evidence regarding the undue burden of production…leads the court to conclude that no such undue burden is present, and that a production is warranted of all documents…").

[10] *See, e.g.*, *Forterra Sys., Inc. v. Avatar Factory*, 2006 WL 2458804, at *1-2 (N.D. Cal. Aug. 22, 2006) (ordering production of entire source code where, *inter alia*, it was "at the heart of the dispute.").

[11] *See* ECF No. 92, Joint Stipulated Protective Order; *see also Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 3246094, at *26 (N.D. Cal. June 26, 2013) (presence of a negotiated and stipulated protective order "sufficiently protected" Apple's interests in its source code production).

**DEFENDANT'S POSITION**

Plaintiffs seek sweeping discovery into all of the source code involved in operating AOSP—crown-jewel intellectual property that Avast uses to analyze URLs for malicious threats and to process enormous volumes of URL lookups in an optimized fashion. Plaintiffs have absolutely no need for this information. Their liability theory hinges on sheer speculation that cookie data that is (incidentally) included in the headers of messages sent to "URLite"—the internal Avast service that processes AOSP data—is actually ingested and processed by that service. As Gen Digital has explained to Plaintiffs ad nauseum—including now in sworn declarations—that speculation is false. Gen Digital has already produced all portions of the URLite source code that pull *any* header data from messages sent to it, none of which pertain to cookie data. Nothing more is needed to disconfirm Plaintiffs' theory—let alone the entire source code involved in operating AOSP. This is a fishing expedition, pure and simple. Plaintiffs' request should be denied.

The background of this matter is set forth more fully in Gen Digital's opposition to Plaintiffs' subpoenas to third parties Adobe and Meta. *See* Dkt. No. 104. In brief, Plaintiffs' liability theory consists of imagining a nefarious motive for facts that have an obvious benign explanation. Plaintiffs have observed that, if a user with AOSP installed on their browser visits the avast.com website—which, like many websites, installs cookies on the user's browser—then subsequently, when their browser transmits messages from AOSP to URLite, those same cookies are included in the headers—i.e., metadata—of those messages. Plaintiffs assert—based on what they politely term "information and belief" but what amounts to freeform conjecture—that the cookies are ingested by URLite, and that Avast then takes any identifiers in the cookies and pairs them with the URLs of the websites visited by the user, and transmits the combined data to third-party advertisers.

In reality, any inclusion of avast.com cookies in the headers of messages sent to URLite is not due to any intended functionality of AOSP but is simply a byproduct of how cookies and

browsers work. Every cookie installed on a browser has a domain associated to it. Whenever the browser communicates with that domain, it checks for cookies associated to the domain and automatically appends them in a cookie header it adds to the communications. Likewise, if the browser communicates with a *subdomain* of the domain set for a cookie, it appends the cookie to the communications. AOSP—as a browser extension—communicates with URLite through a user's browser. The cookies at issue are used on the avast.com website and the domain set for them is avast.com. URLite, as an Avast service, resides on an avast.com subdomain—urlite.ff.**avast.com**. So, when a browser transmits messages from AOSP to URLite, it sees the messages are going to a subdomain of avast.com, checks for cookies associated to avast.com, finds the cookies installed by the avast.com website, and adds them to the headers of the messages. Nothing in the AOSP code asks for this cookie data—it is just reflexively added by the user's browser—and nothing is done with it once the messages hit URLite. Just as someone may ignore something written on the envelope of a letter, URLite pays no attention to the cookie header added by the browser: URLite is instead interested in the *body* of the message, i.e., the URL sent by AOSP for analysis.[12]

Gen Digital has explained all this to Plaintiffs repeatedly—including most recently in sworn declarations categorically attesting that URLite "does not collect, process, store, or otherwise use cookie data in any way." *See* Dkt. No. 107 ¶ 5; *see also* Dkt. No. 106. Gen Digital has also produced all portions of the URLite source code referencing any type of HTTP header. None of these portions reference the cookie header; only other, unrelated headers are used by the code. Gen Digital has also produced documentation from its internal GitHub repository about the data processed by URLite, as well as a downstream service used to improve Avast's threat detection capabilities, which further reflects that neither processes any cookie data.

---

[12] Plaintiffs' suggestion that separating the body of a message from any headers is uneconomical, *see supra* at 5 (suggesting that it "would cost millions of dollars in additional computing power"), is absurd, as this is a basic functionality of any HTTP server. Indeed, URLite has to segregate the body of any message sent to it in order to collect the URL being sent for analysis.

Plaintiffs nonetheless now seek the entirety of "AOSP's current and historical server- and database-side source code"—which they fail to even define, much less explain why they need. Importantly, AOSP depends on a range of servers and databases to operate. First, URL data is transmitted from AOSP to URLite, which looks up the URL against a database of known malicious URLs. The URL data is then passed to a downstream system (known as "Burger") that is used to develop the database that URLite checks against. Burger in turn involves numerous complex subsystems that evaluate URLs for malicious indicators. Producing all of the code underlying all of these systems and subsystems—including not only current code but histories of any changes made—would be a gargantuan undertaking. Moreover, it would consist of intellectual property at the core of Avast's competitive advantage: the URLite code is highly optimized to process large volumes of database lookups and required extensive engineering effort to develop; and the code underlying Burger and its subsystems is essentially the "secret sauce" Avast uses to identify malicious URLs.

There is no reason why Gen Digital should be burdened with producing this highly sensitive information or why Plaintiffs should be permitted to troll through it. The threshold question raised by Plaintiffs' liability theory is whether the cookie headers they see in messages sent to URLite are actually ingested by URLite. Gen Digital has already produced the portions of URLite code with any ostensible relevance to this question—the portions involving header data—which show that no *cookie* header data is processed by the code. In light of that, Plaintiffs have no need to know what any other AOSP-related code does.[13] Indeed, in the parties' most recent meet-and-confer, Plaintiffs

---

[13] Plaintiffs' assertions that they need to review code for Avast systems other than URLite, *supra* at 6, are baseless. URLite is where AOSP sends data, as Plaintiffs themselves have observed. If it does not process any cookies appended to that data, then that is the end of the road for the cookies, and whatever any downstream systems do with other data is irrelevant. As for Plaintiffs' suggestion that the use of a "load balancer" could route AOSP data to somewhere other than URLite, *id.*, this suggestion is likewise baseless and reflects a misunderstanding of what load balancers do: They distribute traffic across multiple *instances* of the *same* service. *See* Google, https://cloud.google.com/load-balancing/docs/load-balancing-overview ("A load balancer distributes user traffic across multiple instances of your applications."). Any AOSP traffic that passes through a load balancer thus ends up at an instance of URLite. There is no other Avast service that receives the traffic and thus no code for such a service that Plaintiffs could examine.

admitted they had no need to examine any code used to analyze URLs for malicious indicators. Yet that is *AOSP's core function* and would of course be what the requested code concerns. Further, Gen Digital asked Plaintiffs to specify what aspects of the code their expert would plan to examine beyond any calls URLite makes to header data. They could not identify anything specific.

"Courts have consistently acknowledged the importance of source code and the fact [that] it is often one of the most valuable assets a company possesses." *Get Seen Media Grp., LLC v. Tiller*, 2021 WL 5083741, *5 (C.D. Cal. 2021) (citation omitted). Accordingly—regardless of any protective order—courts require a showing of "necessity" before ordering the disclosure of source code, including an explanation of why Plaintiffs "cannot obtain the information [they] need by alternative means." *Saleh v. Nike, Inc.*, 2021 WL 4434352, *2 (C.D. Cal. 2021). Plaintiffs cannot meet this standard here. They hardly need to examine all AOSP-related source code merely to determine whether URLite ingests cookie data. The code excerpts already produced provide a sufficient, and far more tailored, means of answering that question. *See Ameranth, Inc. v. Pizza Hut, Inc.*, 2013 WL 636936, *3 (S.D. Cal. 2013) (denying request for "all aspects or elements" of source code where selected portions of the code sufficed to disprove plaintiff's accusations). Moreover, Plaintiffs' assertions that Avast uses cookie data sent to URLite are speculative to begin with—resting on mere "information and belief"—and are contradicted by sworn testimony Gen Digital has provided. Such conjecture is not enough to warrant the intrusive discovery they seek. *See In re Apple & AT & TM Antitrust Litig.*, 2010 WL 1240295, at *2 (N.D. Cal. 2010) (denying request for source code beyond "tailored portions" already produced, where plaintiffs "only speculate that the additional source code may be relevant" and their "assertions appear to be based on 'mere belief'"); *Viacom Intern. Inc. v. Youtube Inc.*, 253 F.R.D. 256, 260 (S.D.N.Y. 2008) (denying request for source code absent plausible showing that defendants' sworn denials were false, because "YouTube and Google should not be made to place this vital asset in hazard merely to allay speculation").

**[PLAINTIFFS' PROPOSED] ORDER**

On the date below, the Court considered Plaintiffs' and Defendant Gen Digital's Joint Discovery Letter re: Source Code. The Court, having considered the Parties' joint letter, as well as any other argument and evidence of record, orders as follows:

The Plaintiffs' requested relief is **GRANTED**.

It is further **ORDERED** that, within 7 days of the date of this Order, Defendant Gen Digital shall produce the entirety of AOSP's and Avast's current and historical server- and database-side source code to Plaintiffs, subject to the terms of the protective order entered in this case.

**IT IS SO ORDERED**.

DATED: ___________________________

___________________________________
The Honorable Sallie Kim
United States Magistrate Judge

**[DEFENDANT'S PROPOSED] ORDER**

On the date below, the Court considered Plaintiffs' and Defendant Gen Digital's Joint Discovery Letter re: Source Code. The Court, having considered the Parties' joint letter, as well as any other argument and evidence of record, orders as follows:

The Plaintiffs' requested relief is **DENIED**.

**IT IS SO ORDERED**.

DATED: ______________________

______________________________
The Honorable Sallie Kim
United States Magistrate Judge

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file the foregoing Plaintiffs' and Defendant Gen Digital's Joint Discovery Letter re: Source Code. Pursuant to Civil Local Rule 5-1(h)(3) regarding signatures, I, Jonathan M. Rotter, attest that concurrence in the filing of this document has been obtained.

Executed this 26th day of September 2024, in Los Angeles, California.

*/s/ Jonathan M. Rotter*
Jonathan M. Rotter

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On September 26, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 26, 2024.

*/s/ Jonathan M. Rotter*
Jonathan M. Rotter